9 F.3d 113
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rodney BROCK, Defendant-Appellant.
 No. 92-2000.
 United States Court of Appeals, Seventh Circuit.
 Argued May 14, 1993.
Decided Oct. 15, 1993.
 
 Before BAUER, EASTERBROOK and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 In a multi-count indictment, Rodney Brock was charged with one count of possession with the intent to distribute and another count of distribution of crack cocaine in violation of 21 U.S.C. Sec. 841(a)(1), one count of engaging in a conspiracy with Jamie Bernard Stockett and others to possess with the intent to distribute crack cocaine in violation of 21 U.S.C. Secs. 841(a)(1) & 846, and one count of possession of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. Secs. 2 & 924(c). Brock was convicted in a bench trial on all four counts and was sentenced to 123 months in prison to be followed by four years of supervised release. He appeals his convictions, and we affirm.
 
 FACTS
 
 2
 The Bureau of Alcohol, Tobacco and Firearms ("ATF") commenced an investigation on May 21, 1991 into the possible distribution of crack cocaine in Washington Park, Illinois. On that date, Special Agent Robert Levingston bought four rocks of crack cocaine from Darrell Lacey, whom Levingston knew as "Red," at a residence located at 1622 North 51st Street in Washington Park. Lacey told Levingston that he could not fill his entire order at that time but that he would sell Levingston what he had available. Levingston returned to 1622 North 51st Street on May 24, 1991, and this time told Lacey that he needed three $50 pieces of crack. Lacey did not have that amount on hand so he sent Levingston to a nearby house located at 1744 North 51st Street, saying that house involved the "same people, same dope." Bobby Lloyd accompanied Levingston to the new location, and he told Levingston that this house was a "new lick," meaning a new location where drugs were stored and sold. At the 1744 residence, Levingston met Stockett and Brock and told them what he wanted. Brock instructed Levingston to purchase two rocks from Stockett and one from himself, but Levingston said he would buy two rocks from each of them. After this sale was consummated, Brock encouraged Levingston to come back to the 1744 residence in the future.
 
 
 3
 One week later, on May 31, Levingston returned to the 1744 residence and again encountered Brock and Stockett. Levingston purchased crack cocaine from Stockett, who was holding a .32 caliber pistol in his hand. Brock acted as a lookout in the front doorway of the residence, and at one point asked Levingston who was out in Levingston's car. Brock also told Levingston that the next time he came, he should pull his car into the driveway.
 
 
 4
 On the evening of May 31, several ATF agents executed a search warrant at the 1744 location. Before the agents entered the premises, Special Agent Dan Owens observed an African-American male run from the rear of the residence. Owens identified himself as a police officer and ordered the man to stop, which the man did for only a moment, glancing back at Owens and then continuing to run. When the man stopped and looked at Owens, he was approximately twenty to twenty-five feet away. ATF agents apprehended Brock shortly thereafter in the course of executing a search warrant at the 1622 North 51st Street location. Owens subsequently identified the man he had seen fleeing from the rear of the 1744 residence as Brock.
 
 
 5
 Agent Donald Veal was the first to enter the 1744 residence, and he observed that there was no furniture, that the windows were sealed, and that the rear door was nailed shut. He also saw a number of $20 bills on the kitchen floor. Another agent encountered Stockett in the house and ordered him to get on the floor, whereupon Stockett dove into the kitchen. He was apprehended there next to a .32 caliber revolver. When Owens entered the 1744 residence, he found a loaded shotgun in the living room near the front door. He also observed in the living room a number of rocks of crack cocaine, a drug ledger, two $10 bills, a cassette tape, a remote control or calculator device, and a scanner used for monitoring law enforcement activities.
 
 
 6
 On June 28, 1991, Levingston and Owens went to Brock's residence to take him into custody. Brock's sister initially told the agents that Brock was not there, but when they returned later the same day, Brock came to the door after the agents had again talked with his sister. When Brock was arrested, Owens found a medicine bottle in Brock's pants pocket containing 3.42 grams of crack cocaine.
 
 DISCUSSION
 A. Sufficiency of the Evidence
 
 7
 Brock first challenges the sufficiency of the evidence supporting his conspiracy and firearms convictions. The cards are stacked against Brock in making such a challenge, as we review the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. DePriest, Nos. 92-3126, 92-3226 & 92-3935, 1993 U.S.App. LEXIS 24545, * 6 (7th Cir. Sept. 21, 1993). This standard does not permit us to reweigh the evidence or to reassess the credibility of witnesses. DePriest, 1993 U.S.App. LEXIS 24545, at * 7.
 
 1. Conspiracy charge
 
 8
 In a sufficiency challenge to a conspiracy conviction, we must be satisfied that "substantial evidence" establishes "that a particular defendant knew of the illegal objective of the conspiracy and agreed to participate in its achievement." United States v. Burrell, 963 F.2d 976, 987 (7th Cir.), cert. denied, 113 S.Ct. 357 (1992); see also United States v. Pazos, 993 F.2d 136, 139 (7th Cir.1993); United States v. Durrive, 902 F.2d 1221, 1229 (7th Cir.1990). A finding of conspiracy may be supported by circumstantial evidence. DePriest, 1993 U.S.App. LEXIS 24545, at * 13; Pazos, 993 F.2d at 139. Indeed, " '[i]f the prosecution presents enough circumstantial evidence to support, beyond reasonable doubt, an inference that the defendants agreed among themselves to distribute drugs, [the finder of fact] would be justified in convicting these defendants of conspiring together.' " Burrell, 963 F.2d at 988 (quoting United States v. Townsend, 924 F.2d 1385, 1390 (7th Cir.1991)).
 
 
 9
 A conspiracy is "an agreement to commit a crime." United States v. Lechuga, 994 F.2d 346, 348 (7th Cir.1993) (en banc). A conspiracy can be characterized as a cooperative relationship that facilitates the achievement of a particular goal--in this case a criminal goal. "To be liable as co-conspirators, defendants must be mutually dependent on one another, or must render mutual support." Burrell, 963 F.2d at 989. Thus, we must consider whether Brock, Stockett, and possibly other unnamed co-conspirators were acting independently when crack cocaine sales were made to Levingston at 1744 North 51st Street or whether Brock and Stockett had agreed to mutually support one another to achieve the common goal of possessing with the intent to distribute crack cocaine.
 
 
 10
 The evidence supports the inference that Brock and Stockett had agreed to distribute crack cocaine. On each occasion that Levingston purchased crack at the 1744 location, Brock and Stockett were present, and on May 31, 1991, Brock acted as a lookout in the front doorway while Stockett, who held a loaded pistol, conducted the sale. Similarly, when ATF agents raided the 1744 residence on May 31, they arrested Stockett, and Agent Owens saw Brock flee from the rear of the residence. The agents also found the implements of a drug conspiracy in the residence--a drug ledger, police scanner, the drugs themselves, large amounts of money, a .32 caliber pistol, and a loaded shotgun. Moreover, the evidence also links Brock to Lacey and perhaps others at the 1622 location because Lacey initially directed Levingston to the 1744 residence, telling him that it involved the "same dope, same people," and Brock then fled to and was apprehended at the 1622 residence when ATF agents executed the search warrant at 1744. Viewing the evidence in the light most favorable to the government, we have no trouble agreeing that a conspiracy to distribute crack cocaine was shown.
 
 
 11
 Brock nonetheless argues that there was no conspiracy because the evidence, at best, establishes a mere buyer-seller relationship between Levingston and Brock and Stockett individually. (Brock Br. at 26-30 (citing United States v. Lamon, 930 F.2d 1183 (7th Cir.1991); United States v. Kimmons, 917 F.2d 1011 (7th Cir.1990); United States v. Cox, 942 F.2d 1282 (8th Cir.1991), cert. denied, 112 S.Ct. 1298 (1992)). Yet as the government points out, the cases on which Brock relies did not involve a situation where both alleged conspirators were present and cooperating with one another at the time of a drug sale. Moreover, we have a series of transactions here in which Brock and Stockett cooperated to distribute crack cocaine to Levingston, and Brock encouraged Levingston to return to the 1744 residence for future transactions. This was not merely a buyer-seller situation. It was a conspiracy between Brock and Stockett to distribute crack cocaine.
 
 2. Firearms charge
 
 12
 Brock also challenges the sufficiency of the evidence supporting his conviction under 18 U.S.C. Sec. 924(c) for use of a firearm in relation to a drug trafficking crime. Brock states that he could not be guilty of the firearms offense because he never had dominion or control over either the .32 caliber revolver or the shotgun and that he therefore did not "use" either weapon within the meaning of the statute. We disagree.
 
 
 13
 We previously have explained that a firearm is
 
 
 14
 "used" under the statute if its presence "increased the likelihood of success" of the drug offense as a means of protection or intimidation, see [United States v. Rosado, 866 F.2d 967, 970 (7th Cir.), cert. denied, 493 U.S. 837 (1989) ] (quoting United States v. LaGuardia, 774 F.2d 317, 321 (8th Cir.1985)), or if its presence provides the defendant with the "security and confidence needed to undertake such a large cocaine transaction." Id.
 
 
 15
 United States v. Vasquez, 909 F.2d 235, 239 (7th Cir.1990), cert. denied, 111 S.Ct. 2826 (1991). The "[l]ack of an opportunity to brandish or shoot" the weapon does not mean that it was not "used" within the meaning of the statute. Id. at 239. Rather, "[d]ealers who keep guns 'in strategic proximity' to their drugs or transactions 'use them in relation to' their drug trafficking for purposes of the statute." United States v. Woods, 995 F.2d 713, 718 (7th Cir.1993). Moreover, in a conspiracy case, the use of a firearm by one conspirator generally may be imputed to his co-conspirators. Pazos, 993 F.2d at 141; United States v. Allen, 930 F.2d 1270, 1275 (7th Cir.1991).
 
 
 16
 Here, there can be no question that Brock used both the revolver and the shotgun in relation to a drug trafficking crime. Stockett held the revolver in the course of the May 31, 1991 drug sale, and Brock knew of Stockett's use of the gun because he was present and acting as a lookout in the front hallway, near where the shotgun was found by ATF agents in their raid on the residence later that evening. Moreover, although Levingston did not see the shotgun in the course of the May 31 transaction, it was found in the residence by the agents just two hours later. It is thus reasonable to infer that the shotgun was present and that it was "used" by Brock and Stockett in the sense of providing security and comfort in the course of the May 31 drug sale. See United States v. Villagrana, Nos. 91-3740 & 92-1521, 1993 WL 370584, * 3-4, 1993 U.S.App. LEXIS 24611, * 9 (7th Cir. Sept. 21, 1993); United States v. Villarreal, 977 F.2d 1077, 1079 (7th Cir.1992) (weapon "used" when it is strategically located so that it is easily available during a drug transaction), cert. denied, 113 S.Ct. 1350 (1993). The evidence was sufficient to support Brock's firearms conviction.
 
 B. Identification Testimony
 
 17
 Brock next challenges the in-court identification testimony of Agents Levingston and Owens on the ground that both agents had viewed a photograph of Brock shortly after the May 31 raid. Because Brock did not object to the identification testimony at trial, we review his argument for plain error. Fed.R.Crim.P. 52(b); United States v. Quintanilla, 1993 U.S.App. LEXIS 21535, * 22 (7th Cir. Aug. 20, 1993); United States v. Wagner, 996 F.2d 906, 916 (7th Cir.1993). We will reverse only if necessary to avert an actual miscarriage of justice. Quintanilla, 1993 U.S.App. LEXIS 21535, at * 22; Wagner, 996 F.2d at 916.
 
 
 18
 We utilize a well-settled, two-part test in considering the admissibility of challenged identification testimony:
 
 
 19
 First, the defendant must establish that the identification procedure was unnecessarily suggestive. If the defendant meets this burden, the court considers whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification--or stated in the affirmative, whether the identification, viewed under the totality of circumstances, is reliable despite the suggestive procedure.
 
 
 20
 Kubat v. Thieret, 867 F.2d 351, 357 (7th Cir.), cert. denied, 493 U.S. 874 (1989); see also United States v. Donaldson, 978 F.2d 381, 385 (7th Cir.1992). The reliability determination rests on our analysis of the following factors:
 
 
 21
 (1) opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation.
 
 
 22
 Donaldson, 978 F.2d at 385 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).
 
 
 23
 To meet his burden under step one, Brock was required to show that the circumstances under which the agents had viewed Brock's photograph were so unduly suggestive that there was a substantial likelihood that the agents' identification was based on an irreparable misidentification. Brock fails at this preliminary step because he points to nothing suggesting that the circumstances were unduly suggestive. Instead, he merely highlights testimony indicating that both Levingston and Owens had viewed photographs taken in connection with the execution of the search warrants and that both had picked out the photograph of Brock. Levingston identified the man in the photo as the individual present with Stockett when he purchased cocaine at the 1744 residence, and Owens identified the photograph as depicting the man he saw fleeing from the residence immediately before the raid. Defendant failed to develop on cross-examination of the agents any way in which this process was unduly suggestive.
 
 
 24
 Because Brock fails at the first step, we need not consider step two, but even so, we conclude that the identification testimony was reliable. Both agents had previously seen Brock--Levingston when he purchased crack cocaine from Brock and Stockett on May 24 and May 31, and Owens when he yelled to the fleeing Brock during the May 31 raid--and they picked his photograph from a pile just a couple of days after the raid. Although Owens had only a brief look at Brock's face, he also identified Brock by his clothing, which he was able to observe for a longer period of time as Brock fled. His description of the fleeing man's clothing was consistent with the clothing worn by Brock when he was apprehended at the 1622 location. Under all the circumstances, therefore, we find that the identification testimony was reliable and that it did not result in an actual miscarriage of justice.
 
 C. Denial of Motion for Acquittal
 
 25
 Finally, Brock contends that the district court erred in denying his motion for acquittal at the close of the government's case-in-chief and also at the close of all the evidence. In particular, Brock argues that there was no credible evidence suggesting that he either distributed cocaine to Levingston on May 24, 1991 or that he possessed crack cocaine when he was taken into custody on June 28, 1991.
 
 
 26
 In reviewing the denial of a motion for judgment of acquittal based upon insufficient evidence, we must consider " 'whether at the time of the motion there was relevant evidence from which the [finder of fact] could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government.' " United States v. Hagan, 913 F.2d 1278, 1281 (7th Cir.1990) (quoting United States v. Reis, 906 F.2d 284, 292 (7th Cir.1990)). Our discussion above of Brock's challenge to the evidence underlying the conspiracy conviction indicates that the evidence was certainly sufficient to support Brock's conviction for distributing cocaine to Levingston on May 24, 1991. Similarly, viewing the evidence in the light most favorable to the government, there also was sufficient evidentiary support for the conclusion that Brock possessed crack cocaine with the intent to distribute it when he was arrested at his home on June 28, 1991. Brock's argument directly challenges Agent Levingston's credibility, but the district court believed the agent and discredited Brock's own story. We will not second-guess that credibility assessment on appeal. Brock's convictions are
 
 
 27
 AFFIRMED.